NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210579-U

NOS. 4-21-0579, 4-21-0580 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 4, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* S.H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County |
| Petitioner-Appellee, | ) | No. 18JA98 |
| v.　　　　(No. 4-21-0579) | ) | |
| Peter H., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| ------------------------------------------------------------------- | ) | |
| *In re* S.H., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.　　　　(No. 4-21-0580) | ) | Honorable |
| Ashley R-M., | ) | Thomas M. O'Shaughnessy, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1　　*Held*: The appellate court affirmed, concluding the trial court's order terminating respondents' parental rights was not against the manifest weight of the evidence.

¶ 2　　　　Respondents, Peter H. and Ashley R-M., appeal from the trial court's order terminating their parental rights to their minor child, S.H. (born September 16, 2018). Respondents filed separate appeals arguing the court's respective fitness and best-interest determinations were against the manifest weight of the evidence. On this court's own motion, we consolidated the appeals. We affirm.

I. BACKGROUND

¶ 3        On September 27, 2018, the Department of Children and Family Services (DCFS) took protective custody of the minor based upon reports of (1) an inability to identify an individual willing to supervise respondent mother's contact with S.H. in respondents' home, (2) respondent mother's ongoing use of illicit substances and (3) a lack of necessary baby items in the home. S.H. was placed in the home of "fictive kin."

¶ 4        On September 28, 2018, the State filed a three-count petition for adjudication of wardship, alleging the minor was neglected pursuant to section 2-3(1)(b) and (c) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b), (c) (West 2018)), in that he was born with "any amount of a controlled substance" in his system (705 ILCS 405/2-3(1)(c) (West 2018)) (count I), and his environment was injurious to his welfare (705 ILCS 405/2-3(1)(b) (West 2018)) due to respondent mother's drug use during her pregnancy (count II), and due to respondent mother and respondent father failing to complete the necessary education required prior to the infant's discharge from the hospital (count III). Respondents participated in an integrated assessment on November 9, 2018.

¶ 5        On May 3, 2019, the trial court entered an adjudicatory order finding the minor neglected on the injurious-environment grounds set forth in count II of the petition upon respondents' stipulation thereto. On November 1, 2019, the court entered a dispositional order finding respondent mother unfit due to her drug abuse issues and respondent father unfit due to his need for parenting education and because respondent mother remained in the home, creating a risk of harm to S.H. The court made the minor a ward of the court and appointed DCFS as guardian.

¶ 6        On September 8, 2020, the State filed a petition to terminate respondents' parental rights, alleging they had failed to (1) maintain a reasonable degree of interest, concern, or

responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) make reasonable efforts to correct the conditions that were the basis for the minor's removal from their care during the nine-month period from December 8, 2019, to September 8, 2020 (750 ILCS 50/1(D)(m)(i) (West 2018)); and (3) make reasonable progress toward the return of the minor to their care between December 8, 2019, and September 8, 2020 (750 ILCS 50/1(D)(m)(ii) (West 2018)). The State also alleged respondent father was depraved (750 ILCS 50/1(D)(i) (West 2018)), but it later withdrew this allegation. Finally, the State alleged it would be in the minor's best interest to terminate respondents' parental rights.

¶ 7        In June 2021, the trial court conducted a fitness hearing where the State called four of the caseworkers as witnesses. Katie Arnold, Erica Davis, Lindsay Hoover, and Jessica Wilson all testified to essentially the same set of facts during their respective tenure as caseworker. Respondents were generally cooperative, maintained contact with the agency, and conducted themselves appropriately during visits with the minor. There were times when contact and visits were sporadic due to either cell phone issues, respondent father's employment, or restrictions due to COVID-19.

¶ 8        Arnold testified that respondent mother's tasks were to (1) engage in substance abuse treatment, (2) participate in individual counseling, (3) complete a parenting course, (4) submit to random drug screens, and (5) maintain suitable and stable housing and employment. The primary focus in this case was respondent mother's addiction to controlled substances and the effect her addiction had on respondent father's relationship with the minor. Unfortunately, respondent mother failed to address her addiction in any substantive manner throughout the life of the case, and respondent father chose to maintain a relationship with her, knowing such relationship would prevent the return of S.H. to his care.

¶ 9          Arnold testified respondent mother completed a detoxification program in September 2019 and was referred to New Directions and Champaign Treatment Center for an assessment and inpatient treatment. However, she failed to participate in either. In fact, in November 2019, respondents' visit with the minor was terminated early because respondent mother was under the influence of an unknown substance. Arnold said the parenting-services provider required respondent mother demonstrate sobriety before participating, which she failed to do. Respondent father completed the parenting classes, but before he could be successfully discharged from the program, the provider wanted to witness his interaction with S.H. to determine whether there were any further issues that needed addressed. However, due to COVID-19, in-person visits were terminated at about this same time.

¶ 10          Arnold testified respondent father had not received the appropriate individual counseling. Although he continued to meet with his parenting instructor after the parenting course ended, the instructor was not a licensed counselor. The agency wanted respondent father to have more "therapeutic support" in learning how to cope with a partner with serious substance abuse issues. The primary concern for respondent father was his continued relationship with respondent mother and how her conduct affected his own mental health and his relationship with S.H.

¶ 11          Arnold, along with the other caseworkers, testified there was never a time when they considered returning S.H. to respondents' care due to respondent mother's inability to maintain sobriety and the fact that respondent father continued to reside with her. Hoover testified respondent mother admitted using heroin on the day of the last court hearing in February 2021. On the ride home from that court date, Hoover had "a direct conversation" with respondent father, telling him he had to choose. She said: "It's either [S.H.] or [respondent mother]." According to Hoover, respondent father said he really " 'couldn't make that choice.' "

¶ 12    During a court recess at the fitness hearing, the trial court ordered respondent mother to submit to a drug drop. As a result, she tested positive for methamphetamine and opiates.

¶ 13    The State rested and respondents presented no evidence. After considering the evidence and arguments of counsel, the trial court found the State had sufficiently proved respondents were unfit as alleged and entered a written order to that effect.

¶ 14    At the August 2021 best-interest hearing, the current caseworker Wilson testified S.H. was doing very well in the foster home he had been in since birth. He had bonded with the foster family, including the siblings in the home. He was in a safe and loving environment, which Wilson described as the "best placement" for him. The foster parents expressed their desire to adopt him. After considering the best-interest report, the testimony presented, and the statutory best-interest factors, the court determined it was in S.H.'s best interest to terminate respondents' parental rights.

¶ 15    This appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, respondents assert the trial court's fitness and best-interest findings were against the manifest weight of the evidence. We disagree.

¶ 18    The Juvenile Court Act sets forth a two-stage process for the involuntary termination of parental rights. 705 ILCS 405/1-1 *et seq.* (West 2020). Initially, the State must establish, by clear and convincing evidence, that the parent is unfit under any single ground set forth in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). See 705 ILCS 405/2-29(2), (4) (West 2020); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the trial court finds the parent unfit, the State must then show by a preponderance of the evidence that termination of parental rights is in the child's best interest. See 705 ILCS 405/2-29(2) (West 2020); *In re D.T.*,

212 Ill. 2d 347, 367 (2004). In this appeal, respondents challenge both of the trial court's findings.

¶ 19 We will not disturb a trial court's finding with respect to parental unfitness unless it is against the manifest weight of the evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005) A decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 20 A. Fitness Determination

¶ 21 Respondents were found unfit on three grounds: (1) they failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) they failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor during a specified nine-month period following the adjudication of neglect (750 ILCS 50/1(D)(m)(i) (West 2020)); and (3) they failed to make reasonable progress toward the return of the minor during two specified nine-month periods following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)). Because only one ground, if properly proven, is sufficient to support the trial court's finding of parental unfitness, we will address the third ground and analyze respondents' failure to make reasonable progress. See *In re D.D.*, 196 Ill. 2d 405, 422 (2001).

¶ 22 Reasonable progress is measured by an objective assessment of a parent's progress in a given nine-month period toward reunification with the minor, which includes compliance with service plans and court directives. *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001). A parent will be found to have made reasonable progress if and only if his or her actions during that period indicate the court will be able to order the minor returned to his or her care in the near future. *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 23 Respondents both claim they made reasonable progress. Respondent mother claims

she maintained housing, attended visits, brought toys and snacks for S.H., and maintained contact with the agency. Only problems with her telephone and a medical issue prevented her from attending substance abuse treatment. She claims "[n]o evidence was presented that [respondent mother] could not care for her child despite her substance abuse issues." The more accurate description is that no evidence was presented that respondent mother *could* care for her child due to her substance abuse issues.

¶ 24　　　　Her primary task was to address her serious substance abuse addiction. She made no reasonable progress toward that task. With no progress in that area, other areas of her recommended tasks were affected. For instance, she could not engage in parenting or participate in a psychological assessment without maintaining at least a period of sobriety. S.H. was born in 2018, and thus, at least since that time, respondent has continuously abused drugs. In fact, she tested positive for methamphetamines and opiates on the day the trial court was to determine whether she was a fit parent. She made no progress toward the return of S.H. at any point during the case. As the caseworkers all testified, they never contemplated a return of S.H. to respondents due to respondent mother's continued and untreated drug addiction.

¶ 25　　　　Respondent father claims he (1) was not the "at-fault parent," (2) maintained housing and employment, (3) attended visits, (4) participated in parenting, (5) received counseling from his mentor, and (6) brought snacks and toys during visits. However, he failed to make reasonable progress toward the ultimate goal of having S.H. returned to his care. As the caseworkers testified, S.H. could not be returned to respondent father if respondent mother remained in the home with her untreated addiction. Respondent father described the "choice between [respondent mother] and his child" as "an impossible position for him to be in." Yet, he ultimately chose to remain in a relationship with respondent mother, knowing this choice would

prohibit the return of S.H. to his care. Respondent mother's addiction and presence in the home effectively defeated any possibility of S.H. being returned to the home, and respondent father failed to make any reasonable progress to have S.H. returned to his care without the risk of S.H.'s exposure to drug addiction.

¶ 26　　　　　Based on the foregoing, we conclude the trial court's fitness findings were not against the manifest weight of the evidence.

¶ 27　　　　　　　　　　　　B. Best-Interest Determination

¶ 28　　　　　Respondents also argue the trial court erred in determining termination of their parental rights was in S.H.'s best interest. We will not reverse a best-interest determination unless it was against the manifest weight of the evidence, which occurs "only if the facts clearly demonstrate that the court should have reached the opposite result." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 29　　　　　Once a trial court has determined a parent is "unfit," it must next determine whether termination of parental rights is in the minor's best interest. See 705 ILCS 405/2-29(2) (West 2020). At the best-interest stage, the focus shifts from the parent to the child, and the issue is "whether, in light of the child's needs, parental rights should be terminated." (Emphasis omitted.) *D.T.*, 212 Ill. 2d at 364. Thus, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* Section 1-3 of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2020)) sets forth the best-interest factors for the court to consider, in the context of the minor's age and developmental needs, when making its best-interest determination: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence;

(8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child.

¶ 30        Here, the trial court's best-interest determination was not against the manifest weight of the evidence. According to the best-interest report, S.H. "has love and support from all parties in this [foster] family" and "has a strong attachment with everyone in this family. He is valued [and] cared for, as well as loved and supported." S.H. was "doing well" at the Head Start program and was "involved in all things that the family does." His foster family met all his needs and intended to provide him with permanence through adoption. Accordingly, we cannot say the trial court's best-interest determination was against the manifest weight of the evidence.

¶ 31                              III. CONCLUSION

¶ 32        For the foregoing reasons, we affirm the trial court's judgment.

¶ 33        Affirmed.